IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CALVIN C. JOHNSON,

    Petitioner,                    No. CIV S-03-0479 MCE GGH P

    vs.

TOM L. CAREY, et al.,

    Respondents.              FINDINGS AND RECOMMENDATIONS

_____/

I. Introduction

        Petitioner is a state prisoner proceeding through counsel with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his 1999 conviction for second degree burglary plus three one year sentence enhancements for prior felony convictions and a three strikes enhancement. Petitioner is serving a sentence of 28 years to life.

        This action is proceeding on the original petition filed March 11, 2003. On July 26, 2006, the court denied all of petitioner's claims but for the claim that petitioner's counsel was ineffective for failing to raise a competency issue. The court ordered an evidentiary hearing as to this claim. At a status conference held August 3, 2006, petitioner's counsel withdrew his request for an evidentiary hearing.

/////

1

For the following reasons, the court recommends that the remaining ineffective assistance of counsel claim be denied.

II. Anti-Terrorism and Effective Death Penalty Act (AEDPA)

The Antiterrorism and Effective Death Penalty Act (AEDPA) applies to this petition for habeas corpus which was filed after the AEDPA became effective. Neelley v. Nagle, 138 F.3d 917 (11th Cir.), citing Lindh v. Murphy, 521 U.S. 320, 117 S. Ct. 2059 (1997). The AEDPA "worked substantial changes to the law of habeas corpus," establishing more deferential standards of review to be used by a federal habeas court in assessing a state court's adjudication of a criminal defendant's claims of constitutional error. Moore v. Calderon, 108 F.3d 261, 263 (9th Cir. 1997).

In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme Court defined the operative review standard set forth in § 2254(d). Justice O'Connor's opinion for Section II of the opinion constitutes the majority opinion of the court. There is a dichotomy between "contrary to" clearly established law as enunciated by the Supreme Court, and an "unreasonable application of" that law. Id. at 1519. "Contrary to" clearly established law applies to two situations: (1) where the state court legal conclusion is opposite that of the Supreme Court on a point of law, or (2) if the state court case is materially indistinguishable from a Supreme Court case, i.e., on point factually, yet the legal result is opposite.

"Unreasonable application" of established law, on the other hand, applies to mixed questions of law and fact, that is, the application of law to fact where there are no factually on point Supreme Court cases which mandate the result for the precise factual scenario at issue. Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000). It is this prong of the AEDPA standard of review which directs deference to be paid to state court decisions. While the deference is not blindly automatic, "the most important point is that an *unreasonable* application of federal law is different from an incorrect application of law....[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant

state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at 1522 (emphasis in original). The habeas corpus petitioner bears the burden of demonstrating the objectively unreasonable nature of the state court decision in light of controlling Supreme Court authority. Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

The state courts need not have cited to federal authority, or even have indicated awareness of federal authority in arriving at their decision. Early v. Packer, 537 U.S. 3, 123 S. Ct. 362 (2002). Nevertheless, the state decision cannot be rejected unless the decision itself is contrary to, or an unreasonable application of, established Supreme Court authority. Id. An unreasonable error is one in excess of even a reviewing court's perception that "clear error" has occurred. Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003). Moreover, the established Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules binding only on federal courts. Early v. Packer, 537 U.S. at 9, 123 S. Ct. at 366.

However, where the state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the federal court will independently review the record in adjudication of that issue. "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

III.  Discussion

*Legal Standard*

The test for demonstrating ineffective assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984). First, a petitioner must show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. Strickland, 466 U.S. at 688, 104 S. Ct. at 2065. To this end, the petitioner must

identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment. <u>Id</u>. at 690, 104 S. Ct. at 2066. The federal court must then determine whether in light of all the circumstances, the identified acts or omissions were outside the wide range of professional competent assistance. <u>Id</u>., 104 S. Ct. at 2066. "We strongly presume that counsel's conduct was within the wide range of reasonable assistance, and that he exercised acceptable professional judgment in all significant decisions made." <u>Hughes v. Borg</u>, 898 F.2d 695, 702 (9th Cir. 1990) (citing <u>Strickland</u> at 466 U.S. at 689, 104 S. Ct. at 2065).

Second, a petitioner must affirmatively prove prejudice. <u>Strickland</u>, 466 U.S. at 693, 104 S. Ct. at 2067. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Id</u>. at 694, 104 S. Ct. at 2068. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." <u>Id</u>., 104 S. Ct. at 2068.

In extraordinary cases, ineffective assistance of counsel claims are evaluated based on a fundamental fairness standard. <u>Williams v. Taylor</u>, 529 U.S. 362, 391-93, 120 S. Ct. 1495, 1512-13 (2000), (citing <u>Lockhart v. Fretwell</u>, 113 S. Ct. 838, 506 U.S. 364 (1993)).

The Supreme Court has recently emphasized the importance of giving deference to trial counsel's decisions, especially in the AEDPA context:

> In <u>Strickland</u> we said that "[j]udicial scrutiny of a counsel's performance must be highly deferential" and that "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." 466 U.S., at 689, 104 S.Ct. 2052. Thus, even when a court is presented with an ineffective-assistance claim not subject to § 2254(d)(1) deference, a [petitioner] must overcome the "presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" <u>Ibid</u>. (quoting <u>Michel v. Louisiana</u>, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)).
>
> For [petitioner] to succeed, however, he must do more than show that he would have satisfied <u>Strickland's</u> test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied <u>Strickland</u>

4

> incorrectly. See Williams, supra, at 411, 65 S. Ct. 363. Rather, he must show that the [ ]Court of Appeals applied Strickland to the facts of his case in an objectively unreasonable manner.

Bell v. Cone, 535 U.S. 685, 698-699, 122 S. Ct. 1843,1852 (2002).

*Background*

Petitioner argues that his counsel was ineffective for failing to raise the issue of his mental competency during trial. Although the background to this claim is contained in the January 14, 2005, findings and recommendations, the court will repeat it here.

Petitioner's trial occurred on April 21 and 28, 1999. The jury returned a guilty verdict on April 29, 1999. Sometime before July 2, 1999, and before sentencing, defense counsel sought to have petitioner referred to a psychologist, Dr. Roeder, for a confidential evaluation[1]

---

[1] Roeder examined petitioner on July 2, 1999 and again on July 16, 1999. He initially opined:

> CURRENT EVALUATION: The evaluation of Mr. Johnson was very difficult to conduct, as his responsiveness appeared to be particularly compromised. Initially, he did not respond to anything that the examiner said or asked him. For example, when asked how long he had been in jail, Mr. Johnson did not respond at all, and when the examiner offered this question in the form of a multiple choice, he chose "a month." When he would answer even the simplest of questions, he would have very long response latencies, sitting in silence until prompted.
>
> Asked why he was in jail, Mr. Johnson responded that he did not know, then added, "I thought you were coming to tell me that." Asked if he recalled being arrested, Mr. Johnson responded, "Was I arrested?" On another occasion, Mr. Johnson indicated that he had not been arrested, but had been brought to Placer County Jail from somewhere else, adding that he was already in prison. A frequent response to various questions was, "alcohol, drugs." He said that he was in prison because of alcohol, drugs, and he is in jail for alcohol, drugs.
>
> Asked about the charges against him, Mr. Johnson responded, "Are you fixing to take me home?" After several other questions in this area, Mr. Johnson finally responded, "My attorney, she knows." The one area in which he was able to offer a response was when he was asked about previous work. He initially responded, "They don't give you no work," but then while standing up and walking around the interview room, he suddenly began to stroke the walls with his fingers and said, "I can paint."
>
> Mr. Johnson was asked whether he was taking or prescribed any medication, and he quickly responded, "No!", his only prompt response to any of the examiner's

5

Dr. Roeder found that petitioner's presentation was consistent with someone suffering from a genuine, severe mental disorder, and that it was very unlikely that an individual with such a significant psychiatric disturbance "*would have been able to function without some rather obvious manifestations of this disorder in the recent past*." (Emphasis added). The doctor further opined that petitioner's "likelihood of a significant, compromising mental disorder does appear to be genuine." The doctor's report also stated the evaluation was difficult because defendant was nonresponsive, and that defendant was not in significant psychological distress.

Defense counsel informed the court on September 7, 1999 of petitioner's potential lack of competency (based in part on Dr. Roeder's earlier conclusions). The court then suspended criminal proceedings pending a competency hearing. The court also referred the matter to Dr. Roeder for an evaluation of petitioner under Section 1368. Petitioner was interviewed by Dr. Roeder on October 1, 1999.[2]

---

questions. He then began a series of responses which were all "drugs!" which culminated in his acting out his using cocaine and heroine.

At a subsequent appointment, Mr. Johnson was administered the Wechsler Adult Intelligence Scale-Revised. Again, however, he was non-responsive during this session, and his intelligence was not able to be measured.

SUMMARY: Although no other records were available on Mr. Johnson, his presentation during the two interviews and evaluation sessions is consistent with an individual suffering from a severe mental disorder. In Mr. Johnson's case, it is very unlikely that an individual with such a significant psychiatric disturbance would have been able to function without some rather obvious manifestations of this disorder in the recent past. Mr. Johnson does not present as in significant psychological distress, and although there were many times during which he was non-responsive, he did not appear to be responding to auditory or visual hallucinations. It may be appropriate to refer Mr. Johnson to a blocked psychiatric facility for more long-term observation and assessment, following which appropriate treatment could be recommended. Although this examiner was initially suspicious of Mr. Johnson's presentation, his symptoms remained consistent across the several evaluation sessions, and the likelihood of a significant, compromising mental disorder does appear to be genuine.

[2] Dr. Roeder made the following observations:

RELEVANT HISTORY: Mr. Johnson was seen previously by the undersigned in July of 1999, at the request of his attorney. At that time, the evaluation of Mr.

6

Johnson was very difficult to conduct, as his responsiveness was particularly compromised; he did not respond to anything the examiner said to or asked of him. Over the course of the first evaluation session, on July 2, 1999, it was finally determined from Mr. Johnson that he had been arrested on some type of drug charges, although he was not able to offer any historical information other than that he is from Oakland and his parents are dead. The one piece of information Mr. Johnson was able to supply is that he has in the past worked as a painter.

At a subsequent appointment on July 16, 1999, an attempt was made to administer the Wechsler Adult Intelligence Scale – Revised to Mr. Johnson, in order to determine his level of cognitive functioning. Again, however, he was non-responsive during the session, and his intelligence was not able to be measured. His presentation during the two interviews and evaluation sessions was consistent with an individual suffering from a severe mental disorder. It was noted that he did not present as being in significant psychological distress. It was recommended at that time that Mr. Johnson be referred to a locked psychiatric facility for more long-term observation and assessment, following which appropriate treatment could be recommended. It was also noted that, it was very unlikely that an individual with such significant psychiatric disturbance would have gone through life or the system without previously being identified. In the examiner's opinion, however, as his symptoms remain consistent across the several evaluation sessions, the likelihood of a significant, compromising mental disorder appeared to be genuine.

PRESENT CONSULTATION: At the time of the previous consultation in July of 1999, it was clear that Mr. Johnson was not competent to stand trial, if indeed his observed mental disorder was genuine, and not malingered. The consultation session on October 1, 1999, began in the same way; Mr. Johnson was completely non-responsive to initial questions, fixing the examiner with an angry glare, and then attempting to leave the locked examination room. After this failed attempt, Mr. Johnson turned to the examiner and said, "Didn't you come to talk to me before?" When the examiner responded in the affirmative, Mr. Johnson said, "You're like the rest of these folks, all full of s—!"

Following this exchange, Mr. Johnson became more talkative, but in an angry manner. He again expressed the thought that, when summoned to the interview room, the examiner had come to release him from jail. When asked questions about his case or the charges against him, Mr. Johnson continued in his non-responsive mode. When, however, the examiner reviewed the things that Mr. Johnson had related in July, including the fact that he had a drug problem, Mr. Johnson became somewhat more responsive.

After a discussion of his problem with drugs, and his desire to be in treatment, an attempt was made to review Mr. Johnson's symptoms with him, utilizing the intervention that an understanding of these symptoms would be necessary in designing a treatment program for him. He was willing to acknowledge depression, would or could not answer questions about nightmares, and when asked about sleep, became very agitated. At this point in the interview, Mr. Johnson said, in a raised voice, "I started using drugs when my dad died." He

Dr. Roeder submitted a written report to the court on October 4, 1999. Roeder opined that petitioner was nonresponsive at times, but less so than in July 1999, than compared to July 1999, petitioner was "much more angry and agitated, and having difficulty accepting the reality of his incarceration . . . . Based on his presentation during the consultation sessions across the last several months, Mr. Johnson is not competent to stand trial . . . ." He also stated that "[w]ithout any records or other history, it is difficult to state with certainty that Mr. Johnson's difficulties in functioning are due to the effects of a *chronic* mental disorder. He is clearly not competent to stand trial at the present time."[3] This second report also expressed some opinions

---

went on to say that this was when he stopped talking, and his mother took him to numerous psychiatrists, "Like you!" for assistance. Mr. Johnson later shared that his father died when he was 12 years old, and he has been using drugs ever since. When the topic of the consultation session was again returned to what assistance Mr. Johnson might require, he requested that he examiner contact his mother, Ella Johnson, in Oakland, giving the phone number. It should be noted that, at the time of the previous consultation, Mr. Johnson had said that both of his parents were dead. Mr. Johnson repeatedly directed the examiner to call his mother. When the examiner asked what information his mother might be able to provide, Mr. Johnson became irate, and physically agitated, yelling at the examiner and making a reference to the examiner's "talking like the Judge." Shortly after this, Mr. Johnson also said, "Everybody thinks I'm crazy; I *ain't* crazy!"

SUMMARY: There has been significant change in Mr. Johnson's functioning from the time of the previous consultation in July of 1999 until the present consultation on October 1, 1999. As was indicated previously, it would be unusual for an individual presenting with Mr. Johnson's level of apparent significant psychiatric disturbance to not have come into contact with mental health personnel in recent past. What has changed since the time of the previous consultation session is that Mr. Johnson appears to be much more angry and agitated, and having a difficult time accepting the reality of his incarceration. Without any records or other history, it is difficult to state with certainty that Mr. Johnson's difficulties in functioning are due to the effects of chronic mental disorder. He is clearly not competent to stand trial at the present time, however, and it may be appropriate to refer him to a locked psychiatric facility for more long term observation and assessment, following which appropriate treatment could be recommended. Mr. Johnson does not present as capable of participating in an outpatient competence restoration program, but instead needs to be treated and assessed for possible medication intervention at a psychiatric facility. Based on his presentation during the consultation sessions across the last several months, Mr. Johnson is not competent to stand trial.

[3] The appellate court noted that "[i]t appears Dr. Roeder was not asked, and never opined, whether defendant was incompetent in April 1999. The record does not show Dr. Roeder

regarding petitioner's mental health as of July 1999 that did not appear in petitioner's earlier report.  Specifically, he stated "[a]t the time of the previous consultation in July of 1999, it was clear that [Johnson] was not competent to stand trial if indeed this observed mental disorder was genuine, and not malingered."

The court held a Section 1368 hearing on October 5, 1999.  The court found, based on Dr. Roeder's most recent report, "defendant is not competent to stand trial."  The court then committed petitioner to Atascadero State Hospital until such time as his competency could be restored.

On January 27, 2000, the Medical Director of the Hospital issued a "CERTIFICATION OF MENTAL COMPETENCE" stating that petitioner had regained mental competence.  Based on this certification, the court held a hearing on February 8, 2000, where it concluded that petitioner was competent, ordered the resumption of criminal proceedings, and set the hearing for March 14, 2000.  Petitioner was then sentenced to a term of 28 years to life.  Petitioner argues (as he did in his state court proceedings) that he was denied due process of law because the court should have found him not competent to stand trial at the time his guilt was determined.

*Analysis*

In the January 14, 2005, findings and recommendations, the court rejected petitioner's claim that the trial court violated petitioner's right to due process by failing to hold a competency hearing during petitioner's trial.  Much of that discussion is relevant to the instant claim.  The court stated,

> To support his procedural due process claim, Johnson relies heavily upon Dr. Roeder's opinion that petitioner suffered from a mental illness and that signs of that illness were likely apparent in the recent past. Roeder gave this opinion just two months after petitioner was convicted and reaffirmed that opinion in October 1999. Petitioner also emphasizes that he was found incompetent in October and

---

was even aware of the fact defendant stood trial in April 1999, and neither of his reports mentions the April 1999 trial.

9

committed to a mental hospital for four months until his competency could be restored. Finally, Johnson points to his behavior during two <u>Marsden</u> hearings as further evidence of his lack of competency. Johnson argues that this evidence coupled with his commitment required the court to hold a ex post facto sua sponte hearing regarding petitioner's competency during the April trial.

The issue here is not whether the undersigned believes that he would have decided petitioner incompetent at his guilt trial based on the later issued psychiatric report (and such was certainly a possibility to be considered by a trial judge), or whether the Ninth Circuit would initially find a due process violation. Rather, the issue here is whether the California Court of appeal, and by implication, the state supreme court, were *unreasonable* in their determinations that no substantial evidence existed which should have raised a reasonable doubt of incompetence in the trial judge's mind. The undersigned has quoted at length from the Court of Appeal, and its rationale cannot be considered unreasonable. The appellate court seriously considered the fact that petitioner had been declared incompetent sometime after the guilt trial, and reasonably determined that the trial judge's "reasonable doubt" should not have been retroactively triggered. Especially important in this context is that petitioner's illness seems to have been sporadic, i.e., he was in fact found to be competent at a later time. Also, in reading the report, one acquires an impression that the guilt finding itself, and the petitioner's realization that he would spend a good bit of his life in prison, triggered the mental illness. Moreover, the transcripts of the trial proceedings before the trial court do not reflect any bizarre or irrational behavior by Johnson. Nor has Johnson pointed to any such behavior despite his reference to his behavior (i.e., comments regarding his inability to understand the judge, his counsel's ineffective assistance of counsel, and outburst regarding a potential Black juror) during the Marsden hearings. Petitioner's trial counsel also did not seek a competency evaluation until after the actual trial and conviction of his client.

To the extent petitioner relies on his behavior during the Marsden hearing and Dr. Roeder's reports to demonstrate error in the trial court's failure to hold an evidentiary hearing as to his competency to be tried and convicted of commercial burglary, such evidence fails to show a due process violation. The trial transcript does not indicate that Johnson lacked understanding of the proceedings or was unable to assist in his defense. Petitioner's behavior and statements during the Marsden hearings are not unusual especially in light of Johnson's potential sentence. Petitioner's reliance on Roeder's reports is also misplaced. Although Dr. Roeder opined that Johnson was suffering from a lack of competence sometime after his conviction, Roeder never suggests that petitioner was incompetent during trial. Moreover, even during Roeder's initial examination of petitioner, Roeder states that Johnson is not in "significant psychological distress." Roeder does not identify what type of mental condition may have caused Johnson's current difficulties or if such condition was the cause in fact of these problems. Roeder's opinion does state, however, that petitioner's condition worsened after petitioner began to appreciate his likely lengthy sentence.

January 14, 2005, findings and recommendations, pp. 17-18.

\\\\\

In the section of the January 14, 2005, findings and recommendations addressing the instant ineffective assistance of counsel claims the court stated that it could not find in any of petitioner's reference to extra-record facts anything that would indicate some salient fact of incompetence, known or knowable to trial counsel, was nevertheless not presented to the trial judge.

As discussed above, petitioner withdrew his request for an evidentiary hearing as to this claim. The only other evidence offered by petitioner in support of the instant claim is a letter addressed to present counsel dated April 18, 2005, from Christopher Heard, a Clinic and Forensic Psychologist. See Petitioner's May 16, 2005, objections, exhibit B. Dr. Heard states that he reviewed petitioner's competency report. Dr. Heard concluded that petitioner's mental status at the time of the offense was an issue that was deserving of further attention. Dr. Heard stated that a full assessment, including a review of all police reports, mental health history, trial transcript, etc. was necessary to reach any final conclusion. In essence, Dr. Heard's letter does not add anything to the record.

Because petitioner has failed to offer any material additional evidence in support of this claim, the court cannot find that counsel was ineffective for failing to raise the issue of petitioner's competency during his trial. Accordingly, this claim should be denied.

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's claim that counsel was ineffective for failing to raise a competency issue be denied; and that judgment be entered.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within 20 days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within ten days after service of the objections. The parties are advised

1 | that failure to file objections within the specified time may waive the right to appeal the District
2 | Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).
3 | DATED: 9/25/06

/s/ Gregory G. Hollows

GREGORY G. HOLLOWS
UNITED STATES MAGISTRATE JUDGE

ggh:kj
john479.fr